OPINION
The Appellees in this case are thirteen landowners in Bethel Township, Ohio, and their agent, Kenneth Golonka. Bethel Township is located in Miami County, but Appellees wanted to annex their land to the City of Huber Heights, which is part of Montgomery County. As a result, Appellees filed a petition with the Miami County Board of Commissioners on May 19, 1999, asking that the land of the thirteen property owners, or about 696.087 acres, be annexed to the City of Huber Heights. The Board then held a hearing on the petition on July 27, 1999. At that time, the Board received testimony and evidence from the landowners, from Huber Heights City officials, and from various Bethel Township officials. Subsequently, on October 21, 1999, the Board adopted a resolution denying the petition., Appellees timely appealed to the Miami County Common Pleas Court and filed the administrative record, including the hearing transcript and exhibits. The trial court did not take additional evidence, but did hold an oral hearing. After considering the evidence, the trial court found that the Board's decision was not supported by a preponderance of substantial, reliable, and probative evidence. Consequently, the court ordered the Board's clerk to enter an order approving the annexation.
The Bethel Township Trustees (Trustees) have now appealed to our court, raising the following assignment of error:
 I. The trial court erred in determining that there was no substantial, reliable and probative evidence to support the proposition that the area to be annexed was unreasonably large.
Upon reviewing the record and the trial court decision, we agree with the trial court's analysis of the facts and applicable law. Accordingly, we find no error and affirm the judgment of the trial court.
Before we discuss the specific issues involved, we should note that our review in cases like the present is quite limited. Specifically, we are required to affirm unless we find:
 "as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence." * * * [The scope] of "questions of law" * * * [includes] an abuse of discretion by the common pleas court.
Oberer Dev. Co. v. City of Fairborn (Apr. 23, 1999), Greene App. No. 98-CA-96, p. 5 (citations omitted).
Under the statutory law of Ohio, a board of county commissioners must enter an order on its journal allowing an annexation if the board finds that the annexation complies with the requirements in R.C. 709.033(A) through (E). No one disputes that the petition in this case complied with subparagraphs (A) through (D). What is disputed, however, is compliance with R.C. 709.033(E), which requires that:
 [t]he territory included in the annexation petition is not unreasonably large; the map or plat is accurate; and the general good of the territory sought to be annexed will be served if the annexation petition is granted.
Regarding this set of requirements, both sides agree that the map or plat was accurate. Both sides also agree that the Board was precluded under Smith v. Granville Twp. Bd. of Trustees (1998), 81 Ohio St.3d 608, from rejecting the petition on the basis of the "general good" of the territory being annexed. Specifically, in Smith, the Ohio Supreme Court held that a key consideration in annexation is the choice of the property owners Id. at 614. The Court strongly implied that the test for general good of the annexed property is satisfied if 100% of the property owners seek annexation. Id. at 614-15. In this regard, the court stressed that services may not be used to justify denial, unless the opposing party proves the annexing city cannot provide needed services. Id. at 615. Additionally, the court said that
 When considering a one hundred percent annexation or sole property annexation, * * * it is even more important not to do a comparison of services to determine what is for the good of the territory.
Id.
In the present case, 100% of the property owners sought annexation, and the evidence clearly indicated that Huber Heights could provide all needed services. Therefore, the Board and the trial court were legally required to find that annexation would serve the general good of the territory being annexed.
At the time of the annexation hearing, the Board was told of the applicability of the Smith decision. In fact, the Trustees' attorney explicitly conceded in his opening statement to the Board that Smith
foreclosed consideration of "the general good" in 100% annexation situations. Despite this fact, the Board's decision erroneously compared the relative ability of the two political subdivisions to provide services. Further, in deciding that annexation would not serve the general good of the territory being annexed, the Board took various other factors into account, such as the respective tax structures of the subdivisions. Again, Smith precludes consideration of factors like income taxes as a matter of law. Id. at 614.
In contrast, the trial court recognized that the Board's decision on general good could not stand under Smith. Notably, counsel for the Trustees also acknowledged this point in oral argument before the trial court. As a result, the sole issue considered by the trial court was whether the area to be annexed was unreasonably large.
Previously, the Board had decided that the proposed annexation area was unreasonably large. However, the trial court considered six specific factual findings of the Board, and found that they were not supported by substantial, reliable, and probative evidence. Again, we agree with the trial court's analysis and decision.
The standard test used for deciding if territories are "unreasonably large" requires consideration of three main points:
 a. The geographic character, shape and size of the territory to be annexed in relation to the territory to which it will be annexed, and in relation to the territory remaining after the annexation is completed;
 b. The ability of the annexing city to provide the necessary municipal services to the added territory; and
 c. The effect on remaining township territory if annexation is permitted.
In re Annexation of 1,544.61 Acres in Northampton Twp. to City ofAkron (1984), 14 Ohio App.3d 231.
Concerning the first point, or prong, the Board stated that "the total acreage and peculiar 22-faceted configuration [of the proposed annexation area] is questionable to say the least." The trial court found no evidence in the record to support this conclusion, and we agree. According to the evidence at the hearing, the annexation would decrease the size of Bethel Township by about 3.1% and would increase the size of Huber Heights by about 5.1%. In a similar situation, we refused to find an even greater percentage of change too large as a matter of law. In reAnnexation of 1,265.2969 Acres in Jefferson Twp. to City of Moraine
(Oct. 16, 1990), Montgomery App. No. 11896, unreported, p. 3 (seven to ten percent decrease in township is not unreasonably large as a matter of law). See also, In re Appeal of Jefferson Twp. Bd. of Trustees (1992),78 Ohio App.3d 493, 499 (five percent of township property is not unreasonably large), and In re Annexation of Territory in Olmsted Twp. toCity of Olmsted Falls (1984), 14 Ohio App.3d 260, 263 (three percent decrease in township is not unreasonably large).
On appeal, the Trustees contend that the size of the acreage alone is not conclusive, and that the parcel's odd configuration provides the required evidence to support the Board's decision. Like the trial court, we see nothing unusual or questionable about the configuration. According to the annexation map, the parcel has an inverted stair-step shape on the southern side. However, this shape is the result of pre-existing, uneven city boundaries. In Trissell v. Bethel Twp. Bd. ofTrustees (Dec. 12, 1997), Miami App. No. 97-CA-35, unreported, we refused to hold landowners responsible for problems which were not caused by the annexation in question. Id. at p. 4. We agree with that approach and follow it here.
The Trustees also criticize the fact that the proposed annexation creates a peninsula. Again, looking at the map, a lane about 20 feet in width extends northward from one lot in the annexation parcel. This lane is approximately 1,000 feet long, intersects with U.S. 40, and is surrounded by non-annexed land. We see nothing objectionable about such a result. In Trissell, we noted that even isolated islands of land are not enough to cause rejection of an annexation petition if the decision to create them was not unreasonable. Id. at p. 3. We then approved an annexation which created a 100 foot wide, one-mile long peninsula. Id.
Part of our reasoning was that owners may choose not to annex all their property. We also noted that the peninsula would not be captive to the annexing city, but would be open to the township. Id. The same observations apply here.
In the present case, connecting the annexation parcel to a highway is not unreasonable, and the landowner was entitled to have a lane on his property included in the annexation. This is not the type of "strip, shoestring, subterfuge, corridor, and gerrymander" annexation which was disapproved in City of Middletown v. McGee (1988), 39 Ohio St.3d 284,287. Instead, 38% of the annexation parcel is contiguous to Huber Heights' corporation lines, and the peninsula simply extends outward from one lot to a U.S. highway. Accordingly, we find that the trial court's decision on the geographic character, size, and shape of the annexation parcel is supported by a preponderance of substantial, reliable, and probative evidence.
The next factor to be addressed is the ability of the annexing city to provide services. In this regard, the Trustees make several arguments. First, they claim that the Board found Huber Heights unable or unwilling to provide needed municipal services, specifically sewer and water. The Trustees then focus on the Board's finding that Miami County had pending contracts with Clark County for water and sewer services to be extended to the proposed annexation area. According to the Trustees, Miami County's aggressive development of water and utility services on its own accord is superior to Huber Heights' services, which are "developer driven." In particular, the Trustees contend that developer driven services are illusory.
In addressing the second factor, the trial court did not compare the services offered by the two political subdivisions. The court noted that while a comparison of services could be relevant, it could not answer the pertinent question of whether Huber Heights had the ability to provide the required services. On this point, the court found no evidence that Huber Heights was unable to provide services. We agree with the trial court.
As we mentioned earlier, the Smith decision indicated that courts should not compare services when 100% of the landowners favor annexation. Smith, 81 Ohio St.3d at 613-17. The Trustees interpret the trial court's failure to compare services as an improper reliance onSmith. Specifically, the Trustees say that Smith applies only to issues of "the general good," and does not affect the "unreasonable largeness" test. According to the Trustees, even after Smith, the test requires courts to compare the services of the respective subdivisions.
We agree that Smith did not address the "unreasonable largeness" test. Instead, Smith dealt only with the appropriate factors for deciding if annexation is for the general good of the territory to be annexed. Id.
Nonetheless, this does not mean that the trial court erred. First of all, the trial court did not say it was relying on Smith. Rather, in making its decision, the court directly referred to the second prong of the "unreasonable largeness" test.
Moreover, the "unreasonable largeness" test does not call for comparison of services. To the contrary, the test itself says that courts are to consider "[t]he ability of the annexing city to provide the necessary municipal services to the added territory." Northampton,14 Ohio App.3d at 231. We have previously interpreted this to mean that proponents must "show that the annexing city has the ability to provide the necessary municipal services, not that the services will be better."In re Petition for Annexation of 131.983 Acres (July 7, 1995), Miami App. No. 94-CA-15, unreported, p. 13.
In the above case, we did say that when a board analyzes this prong of the test, it can consider "problems arising from the configuration and from the overlap of services that the evidence shows was not adequately addressed by the petitioners." Id. We think this type of analysis is appropriate, since confusion of services may bear on a municipality's ability to provide services. In other words, if annexation would cause widespread confusion over who is supposed to deliver services, and those potential problems are documented (and are not addressed by the parties who wish to annex), a board or court could find that the municipality cannot provide needed services. We do note that this would probably be true only in unusual situations. Accordingly, the trial court did not err in failing to compare services.
As the trial court observed, the evidence did not indicate that Huber Heights was unable to provide all needed services. Instead, the testimony and affidavits revealed that the City was willing and able to furnish all required services. Furthermore, the suggestion that Huber Height's services were "developer driven" and, were therefore, inferior to those of Miami County (or illusory) is simply not a correct interpretation of the evidence.
In this regard, the testimony indicated that Appellees were told for a number of years that water would be forthcoming from Miami County, but nothing ever transpired. The closest Miami County hookup to the annexation property is more than a mile and a half away. By contrast, the Huber Heights water line already comes across the back of one of the annexation properties. Sewer lines from Huber Heights are also available, adjacent to residential homes that abut the same property. The Huber Heights City Engineer indicated that the City is in the process of building many roads and providing water and sewer facilities to additional facilities, mostly developer driven. Once developers indicate that sewer and water is needed, the City works diligently to provide service.
The Miami County process is similar. As we mentioned, the area in question does not have central sewer or water. In 1997, Clark County told Miami County that it was willing to supply water to Bethel Township, and that intergovernmental agreements should be prepared. However, agreements with Clark County had not yet been signed by the time of the annexation hearing.
The initial phase of the proposed Miami County project will place a water supply line in the proximity of the annexation area, at Mann Rd. and U.S. 40. At the time of the hearing, Miami County had applied for grant money to extend water service to Brandt, which was an unincorporated community served by wells and septic tanks. The Miami County Comprehensive Plan indicates that Brandt is located in planning area 166, some distance from the annexation properties, which are located in area 172. Similarly, Mann Rd. is in the northeast corner of planning area 173, also some distance from the annexation site. According to the Miami County Engineer, extensions to the annexation property were not currently planned. However, water could later be extended and sewers could be constructed as the land develops.
In 1990, the Clark County sewer plant was expanded, with the intent of possibly considering expanding sewer services to the area of the annexation. However, no construction drawings have been done for sewers, and no grants or approvals for sewer construction had been made at the time of the hearing. The engineering studies which have been done concern only water, not sewer. Additionally, Miami County's Planning Director testified that Miami County has basically the same policy as Huber Heights — i.e., any water or sewer extension would usually have to be done at the developer's cost.
Thus, while Clark County may be willing to process Bethel Township's water and sewer, the fact is that the means for connecting to Clark County are still in the planning stages. In fact, sewer service is little more than a distant speck on the horizon. By contrast, Huber Heights has connections in close proximity to the annexation site and is willing to provide the needed services. And, in either jurisdiction, developers will have to pay for extending water and sewer to the particular area.
Based on the above facts, one could argue that Bethel Township's services are inferior. However, as we said, the trial court did not have to compare services. Instead, the court only had to find that Huber Heights was able to provide the needed services. This was obviously true. Accordingly, the trial court's finding on the second prong of the "unreasonable largeness" test was supported by a preponderance of substantial, reliable, and probable evidence.
The final prong of the test requires consideration of the effect of the annexation on the remaining township territory. In this regard, the Trustees focus on the fact that the annexation would deprive Bethel Township of the majority of developable land in the township as specified by the Miami County Comprehensive Land Use Plan. In addressing this point, the trial court found the argument speculative because of a lack of evidence that any of the annexed or un-annexed land would ever be developed. Further, the court noted that annexation would not destroy the comprehensive land use plan. Instead, it would simply change the party who would develop the land (perhaps more properly characterized as the party who would benefit from the development, in the form of tax revenue).
In evaluating the effect of annexation on remaining township territory, tax revenue is the factor typically considered. InNorthampton, the court explained that:
 ["i]f the territory sought to be annexed is so great a portion of the township's tax base that the annexation would render the remaining township incapable of supporting itself, then the Board might reasonably conclude the proposed annexation is unreasonably large, although such annexation would benefit the territory sought to be annexed."
14 Ohio App.3d at 232, quoting from Herrick v. Bd. of County Commrs. (Jan. 23, 1980), Summit App. No. 9425, unreported, at 6. Concerning this factor, we have previously held that opponents must "show that the remaining portion of the township will be unable to support itself without the tax revenues from the annexed area." In re Petition forAnnexation of 131.983 Acres (July 7, 1995), Miami App. No. 94-CA-15, unreported, p. 14. See also, In re Annexation of 1,265.2969 Acres inJefferson Twp. to City of Moraine (Oct. 16, 1990), Montgomery App. No. 11896, unreported, p. 3.
The evidence presented in this regard was that the potential tax loss to Bethel Township would be small. For example, the annexation property contributes about $67.00 to the general fund (out of a budget of $1,278,499.97), and $1,914.54 to fire protection (out of a budget of $250,275). Township witnesses conceded at the hearing that the omitted budget dollars would not materially impact their ability to serve the township. As a result, the property to be annexed was not unreasonably large.
Furthermore, even if the impact on developable land were an appropriate consideration, the Trustees did not show that annexation would have a debilitating effect on the rest of the township. In re Appeal ofJefferson Twp. Bd. of Trustees (1992), 78 Ohio App.3d 493, 499. In this regard, the Board stated that annexation would consume the greater part of developable land in the township and would destroy the land use plan. On appeal, the Trustees echo this position, pointing out that the proposed annexation will remove 700 of the 870 acres designated as a special planning area. According to the Trustees, only these 870 acres of township land can be developed because the rest of the township land is located on bedrock, or is in a flood plain.
The evidence revealed, however, that Bethel Township has other land that can be developed. The total township acreage is about 22,344 acres and only 3,818 acres have been developed. Of the remaining land, the Miami County Comprehensive Land Use Plan has designated large areas as an "agricultural protection area." The purpose of this category is to preserve prime farm land and resist "sprawl." While these are noteworthy goals, Miami County's choice to earmark certain areas for various uses does not, therefore, mean that those areas are incapable of being developed. Purely as an example, Planning Area 176 contains 1,176 acres and has no listed restrictions on development, in the form of bedrock, flood plain areas, or inadequate drainage.
Accordingly, annexation would not have a debilitating effect on the township and would not destroy the comprehensive land use plan. Admittedly, Huber Heights may potentially garner the benefit of development, in the form of increased tax revenue. However, as the trial court correctly noted, a lack of evidence existed concerning development of annexed or un-annexed land. Specifically, while some of the petitioning owners had listed their property for sale, no definite development plans were in place. More important, the record contains no evidence about the future impact of development on the township's tax base.
In light of the preceding discussion, we agree with the trial court that the Board's decision was not supported by a preponderance of substantial, reliable, and probative evidence. Consequently, Appellant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
 __________________ BROGAN, J.
GRADY, P.J., and FAIN, J., concur.